UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON W. EVITTS,

               Plaintiff,                        Civil Action No. 11-cv-14609

          v.                               District Judge Julian Abele Cook
                                           Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 13]**

Plaintiff Shannon Evitts brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 12, 13; *see also* Dkt. 14), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that substantial evidence supports the Administrative Law Judge's weighing of the opinion evidence. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On August 3, 2009, Plaintiff filed an application for SSI alleging disability beginning October 31, 2008. (Tr. 13.) The Commissioner initially denied Plaintiff's disability application on March 25, 2010. (*Id.*) Plaintiff then filed a request for a hearing, and on March 14, 2011, she appeared with counsel before Administrative Law Judge ("ALJ") JoErin O'Leary who considered the case *de novo*. (Tr. 29-56.) In a March 25, 2011 decision, ALJ O'Leary found that Plaintiff was not disabled. (Tr. 13-22.) The ALJ's decision became the final decision of the Commissioner on October 5, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on October 20, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 23 years old on her SSI application date and 25 years old at the time of the ALJ's decision. (*See* Tr. 13, 22, 119.) Plaintiff has a high school education. (Tr. 127.) She has limited past work experience as a cashier, baker, and laundry attendant. (Tr. 147.) According to a medical report,

> Her last and longest job was [in 2007], waitressing at a golf course. This was part-time and seasonal work. After the season was over, the claimant just did not get rehired. She worked there about six months total.

(Tr. 306; *see also* Tr. 147.)

#### 1. Plaintiff's Testimony at the Hearing Before the ALJ

At her March 14, 2011 administrative hearing, Plaintiff testified regarding her mental impairments: bipolar disorder, depression, anxiety, and panic attacks. (Tr. 31.) Regarding her bipolar disorder, Plaintiff testified that her mood can be up and down in the same day. (Tr. 34.)

2

When she is in a down mood, Plaintiff said, "I just kind of want to be by myself, and not be bothered by other people." (Tr. 34.) She testified to having experienced uncontrolled spending (maxing out credit cards) in her up mood and being up for "three days at a time." (Tr. 34-35.) She also stated that she has crying spells "every day" and, sometimes, "five [or] six times a day." (Tr. 43.)

Regarding her anxiety, Plaintiff stated that she feels "panicky" when she is around "large groups of people," for example at a shopping center. (Tr. 36.) She conceded, however, that she would be "okay" around a small crowd (Tr. 41.) Plaintiff also testified to sleeping with her car keys so that she could press the car-alarm panic button if something were to happen. (Tr. 44.)

Plaintiff also reported concentration problems. (Tr. 39.) She stated that she cannot "focus on one thing at a time. I've got like hundreds of ideas in my head, and I'll try to start each and every one of them, and I never finish anything I start." (Tr. 39.) Plaintiff elaborated, "If I start the dishes, it'll take me probably a day to do them. Because I'll just start them, and then I'll just leave them in the sink . . . ." (*Id.*)

Plaintiff has been prescribed a number of medications for her mental conditions. (Tr. 32.) She said she requires reminders to take them, and, at times, she has not taken her medication for a few weeks because "I just don't remember to take them, and I just feel like they don't work sometimes." (Tr. 37.) Plaintiff stated that she experiences weight fluctuations and drowsiness from her medications. (Tr. 38.)

Plaintiff testified that she lives in a townhome with her son and fiancé. (Tr. 31.)[1] In a family therapy setting, Plaintiff said she does puzzles and colors with her son. (Tr. 40.) Plaintiff agreed that she is able to take care of herself "pretty regularly," but added, "I don't really care much about

---

[1]Plaintiff is the mother of three children, two live with her brother. (Tr. 307.)

my appearance anymore." (Tr. 39.)  In a self-completed function report, Plaintiff provided that on

a typical day she wakes up her son, dresses him, and feeds him breakfast.  (Tr. 138.)  She watches

TV for most of the day, puts her son down for a nap, and then takes a nap herself.  (*Id.*)  When the

two wake, they watch some TV and then have dinner.  (*Id.*)

### 2.  Medical Evidence

On July 7, 2005, when Plaintiff was 19 years old, she completed an intake form for treatment

at Saginaw Psychological Services ("Saginaw Psychological").  (Tr. 190-95.)  Plaintiff described

her problems as follows: "I am not right in my head.  I can't concentrate, I have behavioral

problems.  Also an anger problem[.]  I have been incarcerated [two] times as an adult and [two]

times as a juvenile for [domestic] violence with my mother."  (Tr. 190.)  Plaintiff stated that she

"need[ed] someone to talk to and help me[.]  I have tried committing suicide before for lots of

reasons."  (Tr. 190.) Plaintiff also reported drinking a significant amount of alcohol each week.  (Tr.

193.)

On July 11, 2005, social worker David Eckert at Saginaw Psychological completed a "Client

Strengths/Needs Based Assessment."  (Tr. 196.)  Eckert found that Plaintiff's mood was depressed

but her affect appropriate.  (Tr. 200.)  Plaintiff's immediate and remote memory were intact, her

insight was intact, her thought process was logical and organized, and her intelligence was average.

(Tr. 200.)  He found that Plaintiff's judgment was immature.  (Tr. 200.)

Later in July 2005, Dr. Venkateswara Talasila, a psychiatrist at Saginaw Psychological,

completed a psychiatric evaluation of Plaintiff.  (Tr. 216-18.)  Plaintiff reported two suicide

attempts, the first at age 12.  (Tr. 216.)  Plaintiff stated that she also started drinking alcohol at age

12.  (Tr. 216.)  Plaintiff reported feeling depressed and having poor concentration and crying spells.

4

(*Id.*)  Dr. Talasila's mental-status exam revealed that Plaintiff's thought processes were logical and goal directed, her thought content had no delusional thinking, she did not have suicidal or homicidal ideation, and Plaintiff's memory was intact.  (Tr. 217.)  Dr. Talasila found, however, that Plaintiff's concentration was poor.  (*Id.*)  He diagnosed dysthymia and rule-out diagnoses of bipolar disorder, substance abuse mood disorder, and attention deficit hyperactivity disorder ("ADHD").  (*Id.*)  He assigned Plaintiff a Global Assessment Functioning ("GAF") score of 40.  (*Id.*)[2]

In September 2005, Dianne Sherman, Ph.D., a licensed psychologist, performed an examination of Plaintiff to determine her competency to stand trial on domestic violence charges. (Tr. 226-32.)  Plaintiff reported a history of ADHD and, more recently, a variable mood, including staying up for two-and-half days cleaning her room.  (Tr. 228.)  Dr. Sherman found that Plaintiff's mood was essentially normal "without signs of significant depression, mood elevation, or anger." (Tr. 227.)  She found that Plaintiff's "attention and concentration appeared normal" and that Plaintiff "appeared to comprehend all inquiries made of her."  (Tr. 227.)  Dr. Sherman concluded that Plaintiff was competent to stand trial.  (Tr. 226, 230.)

From February 2008 to October 2008, Plaintiff treated with therapist Steven Clark.  (Tr. 335.)  In an undated note or letter (possibly completed in March 2010), Clark remarked that Plaintiff

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.

A GAF score of 31 to 40 corresponds to "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *DSM-IV* at 34.

5

"most recently reentered treatment to deal with overwhelming feelings of anxiety and depression." (*Id.*) He provided that Plaintiff suffered from major depression, severe, and recurrent. (*Id.*)

From January 2007 through November 2009, Plaintiff was prescribed medications for her anxiety by her primary care physician. (Tr. 259-60, 277, 280, 282, 286, 288, 290, 294, 297, 299, 300, 302.) Plaintiff's prescriptions included Prozac, Cymbalta, Wellbutrin, and Xanax. (*Id.*) On July 15, 2009, Plaintiff's primary-care physician noted that Plaintiff was doing well on Xanax. (Tr. 291.)

On March 9, 2010, Dr. Bruce Fowler, a psychologist, examined Plaintiff on behalf of Michigan's Disability Determination Service. (Tr. 305.) Plaintiff reported that she disliked leaving her home and that she suffered from anxiety attacks that felt like heart attacks. (Tr. 305.) She also reported depression and forgetting to renew her prescriptions. (Tr. 305-06.) Dr. Fowler performed a mental-status exam. (Tr. 308.) It revealed that Plaintiff could perform serial 3's (consecutively adding 3) and serial 7's forward. (*Id.*)[3] But Plaintiff stated that she could not perform serial 7's backwards. (*Id.*) Dr. Fowler diagnosed panic disorder with agoraphobia, depressive disorder not otherwise specified ("NOS"), attention deficit hyperactivity disorder NOS (based on Plaintiff's reporting) and assigned Plaintiff a GAF score of 54. (Tr. 309.)[4] Dr. Fowler concluded,

> PROGNOSIS:
>
> Fair. In addition to the psychotherapy this claimant is receiving, she should resume psychotropic medications to get the full treatment

---

[3]Serial 7's is a simple concentration and attention test. *See Teel v. Comm'r of Soc. Sec.*, No. 10-13154, 2011 WL 4484864, at *1 n.2, *5 (E.D. Mich. Sept. 26, 2011).

[4]A GAF score of 51 to 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

> benefit for her anxiety and depression.

> Based on this examination, the claimant is able to understand, retain and follow instructions of probably moderate complexity. She does not appear to have any intellectual deficits that would impair her ability to perform a job and to make independent work-related decisions. However, her current symptoms of depression and anxiety are severe enough to interfere with her ability to perform any job on a consistent and reliable basis. With effective treatment, she should be able to resume work again.

(Tr. 310.)

On March 25, 2010, Dr. Robert Newhouse reviewed Plaintiff's medical file, including Dr. Fowler's report, and completed a Psychiatric Review Technique form ("PRTF") and a Mental Residual Functional Capacity ("RFC") Assessment form. (Tr. 312-28.) On the PRTF, Dr. Newhouse rated the "B" criteria associated with the social security mental-impairment listings. (Tr. 313, 315, 317, 322.) Dr. Fowler found that Plaintiff was moderately limited in maintaining social functioning and moderately limited in maintaining concentration, persistence, or pace. (Tr. 322.) On the Mental RFC Assessment form, Dr. Newhouse provided that Plaintiff was moderately impaired in (1) understanding, remembering, and carrying out detailed instructions, (2) maintaining attention and concentration for extended periods, (3) working in coordination with or proximity to others without being distracted by them, and (4) interacting appropriately with the general public. (Tr. 326-27.) He also found that Plaintiff was moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 327.) He nonetheless concluded,

> MSS [Dr. Fowler's mental status screening?] is noted and suggests she is able to understand, retain and follow instructions of probable moderate complexity. With effective treatment she should be able to

7

> resume work again.  This is felt to be consistent with [medical evidence of record] and is given great weight.  The sustainability issue mentioned is not given great weight as she is currently able to function some outside of [the] home and she is in treatment.  [Claimant] [m]ay function best in small familiar group with limited public/peer contact.  Retains the ability to do tasks on sustained basis.

(Tr. 328.)

On May 28, 2010, Dr. Douglas Foster, a specialist in psychiatry and addictionology, completed a Medical Needs form and a Medical Examination Report for the State of Michigan Department of Human Services.  (Tr. 343-48.)  He indicated that Plaintiff had limitations in memory and social interaction.  (Tr. 348.)  In support of these findings, Dr. Foster provided that Plaintiff was tearful, sad, and depressed, and that Plaintiff was paranoid of interpersonal relationships.  (Tr. 348.)  Dr. Foster's diagnoses were bipolar disorder and alcohol abuse by history.  (Tr. 343, 345.)  He marked a box indicating that Plaintiff could not work at her "usual" occupation but did not indicate whether she could work at "any" occupation.  (Tr. 344.)  Dr. Foster also provided that Plaintiff was unable to attend job education or training because her mood was unstable, and because she was anxious and paranoid.  (*Id.*)

### 3.  *Vocational Expert's Testimony at the Hearing Before the ALJ*

At Plaintiff's administrative hearing, the ALJ asked a vocational expert ("VE") to consider a hypothetical person with functional limitations approximating Plaintiff's limitations.  In particular, the ALJ asked the VE to consider

> a hypothetical individual of the claimant's age, education, and work experience, who had no exertional restrictions, but would have a number of non-exertional limitations.  Specifically, this individual would be limited to work involving only four to five step instructions.  They would be limited to low stress work, which in this instance would be defined as having no more than occasional decision making, or changes in the work setting.  They would not be able to

> perform at a production rate, or a fast paced production environment. . . .  In addition to that, the person would not be able to tolerate interaction with the public, and they would be limited to no more than occasional interaction with coworkers and supervisors.

(Tr. 52-53.)  The VE testified that such an individual could work as a dishwasher with 5,000 jobs available in the regional economy.  (Tr. 54.)

The ALJ then asked the VE to consider a second hypothetical individual with the same limitations as the first except that the person would have to be off task about 25 percent of the workday because of poor concentration.  (Tr. 54.)  The VE testified that there would not be jobs available for this second individual.  (*Id.*)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Supplemental Security Income is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe

9

impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 3, 2009 — Plaintiff's SSI application date.  (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairment: bipolar disorder.  (Tr. 15.)  Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment.  (Tr. 15-17.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> she would be limited to work involving only four to five step instructions. The claimant would require low stress jobs. Low stress in this instance being defined as having no more than occasional decision making or changes within the work setting.  She would not be able to perform at a production rate or in a fast-paced production environment. The claimant could tolerate no interactions with the public and no more than occasional interactions with coworkers or

10

supervisors.

(Tr. 18.)  At step four, the ALJ found that Plaintiff had no past relevant work.  (Tr. 20.)  At step five,

the ALJ relied on VE testimony in response to her hypothetical, and found that Plaintiff could work

as a dishwasher with 5,000 such jobs available in the regional economy.  (Tr. 21.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence

in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

because of the agency's procedural lapses." (internal quotation marks omitted)).   Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also

Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it

must be affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of

11

choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff's primary claim of error is that the ALJ did not correctly weigh the opinions of Drs. Foster, Fowler, and Newhouse. (Dkt. 12, Pl.'s Mot. Summ. J. at 7-10.) Plaintiff argues that Dr. Foster was a treating source and his opinion that Plaintiff could not work at her usual occupation should have been given great, if not controlling, weight. (*See* Pl.'s Mot. Summ. J. at 8-9; Dkt. 14, Pl.'s Resp. to Def.'s Mot. Summ. J. at 2.) Plaintiff also points out that Dr. Fowler examined her and found that her symptoms of depression and anxiety were severe enough to interfere with her ability to perform any job on a consistent and reliable basis. (*Id.*) As for Dr. Newhouse, Plaintiff notes that

12

he was only a non-examining, file-review physician. (*See* Pl.'s Resp. to Def.'s Mot. Summ. J. at 2.) Thus, it is Plaintiff's claim that the ALJ erred in giving a treating-source opinion (Dr. Foster's) "some" weight, an examining opinion (Dr. Fowler's) "little" weight, and a non-examining opinion (Dr. Newhouse's) "great" weight. (*See* Pl.'s Mot. Summ. J. at 8-9; Pl.'s Resp. to Def.'s Mot. Summ. J. at 2; Tr. 19-20.) Plaintiff's argument is compelling, but, ultimately, the Court disagrees.

As an initial matter, a premise of Plaintiff's argument regarding Dr. Foster – that Dr. Foster is a treating source – is faulty. The record reflects that at the time Dr. Foster completed the forms for Michigan's Department of Human Services in May 2010, Dr. Foster had seen Plaintiff on only one occasion. (Tr. 306 (March 2010 medical report stating that Plaintiff would begin seeing Dr. Foster "soon"); Tr. 344 (providing April 13, 2010 as date Dr. Foster last saw Plaintiff); Tr. 345 (providing April 23, 2010 as date Dr. Foster first saw Plaintiff); Tr. 347 (providing that last visit with Dr. Foster was in "April 2010" and next visit would be "June 18, 2010").)[5] "[A] plethora of decisions unanimously hold that a single visit [to a physician] does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 507 (6th Cir. 2006). Further, even if Dr. Foster and Plaintiff subsequently developed the requisite treating-source relationship, his May 2010 opinion was still not entitled to treating-source deference. *See Kornecky*, 167 F. App'x at 506 ("[T]he relevant inquiry is not whether [the examining doctor] might have become a treating physician in the future if [Plaintiff] had visited him again. The question is whether [the physician] had the

---

[5]One of the two April 2010 dates is a "typo" or misprint but, whichever is correct, it remains that Dr. Foster had not seen Plaintiff more than once prior to completing the forms in May 2010.

ongoing relationship with [Plaintiff] to qualify as a treating physician at the time he rendered his opinion" ).  Because Dr. Foster's May 2010 opinion was not a treating-source opinion, it was not entitled to special deference, and, further, the ALJ was not required to comply with the explanatory requirement associated with the treating-source rule.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) ("The Social Security Administration gives the most weight to opinions from a claimant's treating source; accordingly, an ALJ is procedurally required to 'give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion.' [*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).]  However, this requirement only applies to *treating* sources.").

Nonetheless, Drs. Foster and Fowler were examining sources, and the regulations provide that "generally," examining sources are to be given more weight than non-examining sources.  *See* 20 C.F.R. § 404.927(d)(1).  Thus, the Court must decide whether – given the particulars of this case – substantial evidence supports the ALJ's conclusion to give Dr. Newhouse's non-examining opinion more weight than the examining opinions of Drs. Foster and Fowler.  *See Ealy*, 594 F.3d at 515 (acknowledging general rule that more weight is given to examining sources but finding that substantial evidence supported the ALJ's decision to give more weight to non-examining opinion).  While close, the Court believes that the ALJ's weighing of the three opinions falls within the permissible "zone of choice," *see Mullen*, 800 F.2d at 545, and, therefore, cannot be disturbed by this Court.

First, the ALJ reasonably concluded that Dr. Fowler's opinion "does not clearly state limitations and is equivocal in its nature."  (*See* Tr. 19.)  The primary statement Plaintiff relies upon, "[the claimant's] current symptoms of depression and anxiety are severe enough to interfere with

14

her ability to perform any job on a consistent and reliable basis," provides that Plaintiff's symptoms would "interfere" with her ability to work on a sustained basis — it does not unambiguously state that those symptoms would, say, "preclude" or "prohibit" such work.  Further, Dr. Fowler's next sentence, "With effective treatment, she should be able to resume work again," significantly qualifies the statement in question.  Earlier in his report, Dr. Fowler provided, "claimant is not taking any medications" (Tr. 306); he also noted, "In addition to the psychotherapy this claimant is receiving, she should resume psychotropic medications to get the full treatment benefit for her *anxiety and depression*" (Tr. 310 (emphasis added)).  Thus, Dr. Fowler found that in her "current," unmedicated state, Plaintiff's depression and anxiety were severe enough to interfere with her ability to work any job.  But he also found that when Plaintiff resumed medication, she "should be able to resume work again."  So read, Dr. Fowler's opinion on disability is mixed, and, arguably, even supports the ALJ's conclusion that Plaintiff could work as a dishwasher.  *See* 20 C.F.R. § 416.930 ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work . . . .").[6]

---

[6]The Court is aware that "[F]ederal courts have recognized that a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without justifiable excuse.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quoting *Mendez v. Chater*, 943 F. Supp. 503, 508 (E.D. Pa.1996)).  But, in this case, it is not clear that (1) Plaintiff is in fact noncompliant with her medication regimen, or (2) that Plaintiff's mental impairments are such that she is incapable of being compliant.  She testified, "I've had my times where I've gotten off [my medications], and stayed off them for a few weeks, and then I'll start taking them again, and – because I just don't remember to take them, and I just feel like they don't work sometimes, so I just stop taking them." (Tr. 37.) But she also testified that when someone points out that she is not taking her medication and is acting differently, "if I think about it for long enough, I'll agree, and I'll take them." (Tr. 38.) She also said that she had been prescribed the same combination of medication for about a year and that people, including her fiancé, reminded her take medications. (Tr. 33, 37.) She also stated that her medication helped her get along better with others. (Tr. 35.)

Second, although not strong evidence, the Court cannot say it was unreasonable for the ALJ to conclude that Plaintiff's activities of daily living undermined Dr. Fowler's suggestion that Plaintiff's symptoms prevented work at "any" job on a consistent and reliable basis. (*See* Tr. 19.) As the ALJ noted, Plaintiff provides some care for her son, prepares meals (including big meals which Plaintiff spends two hours to prepare), can handle her finances, and spends 8-10 hours per day playing cards, playing games online, and watching TV. (Tr. 16, 138, 140, 142.) Further, as Plaintiff reported to Dr. Fowler, Plaintiff worked part-time as a waitress at a golf course until the season ended (not until her mental impairments precluded work). (Tr. 306.) These activities suggest that Plaintiff may be able to adequately perform some job, e.g., work as a dishwasher, without, as Dr. Fowler suggested, prohibitive interference from her depression and anxiety.

Third, although also not strong evidence, the ALJ was also arguably correct in noting that Plaintiff's recent treatment history was not commensurate with symptoms preventing performance of any job on a consistent and reliable basis. (*See* Tr. 19.) In particular, at the hearing, Plaintiff testified that she had not been hospitalized for at least four years and that she attended counseling only twice per month. (Tr. 33.)

Finally, Dr. Newhouse reviewed Dr. Fowler's report and directly contradicted the finding Plaintiff now relies upon. He provided that "The sustainability issue mentioned is not given great weight as she is currently able to function some outside of [the] home and she is in treatment. . . . [Claimant] [r]etains the ability to do tasks on sustained basis." (Tr. 328.) Based on context, Dr. Newhouse could have only reasonably been referring to Dr. Fowler's statement that Plaintiff could not perform any job on a "consistent and reliable basis." (*See* Tr. 324, 328.)

As for Dr. Foster's opinion, the ALJ reasonably concluded that it too was equivocal. (Tr.

16

19.)  As the ALJ recognized, Dr. Foster found that Plaintiff could not work her "usual" occupation, but declined to find that Plaintiff could not work "any" occupation.  (Tr. 334.)  Plaintiff did not adequately explain this omission at the hearing:

> ALJ: Okay.  Were you able to – does her psychiatrist do any medical source statements, or because some places are so swamped they just don't do them.
>
> ATTY: Yeah, she has Dr. Foster, who gave us the one. . . .
>
> ALJ: I looked at that.  I don't really – just to be blunt, I don't really understand it. . . .  Is there a part where he indicates she's disabled, or not disabled?
>
> ATTY: It says can't work usual occupation, depressed, paranoid in judgment . . . .  And then there's an entry 5/28/10 that talks about her being very paranoid, bipolar, unable to sleep, problem with memory and social interaction.
>
> ALJ: Right, but the follow up question – can't do usual occupation.  Then it says, "Can they work at any job?" and it looks blank.
>
> ATTY: Yeah, that's the best we've got, your honor.
>
> ALJ: That's the best you've got, okay.

(Tr. 46.)  And Plaintiff has provided no better explanation for Dr. Foster's omission to this Court.  Although a Plaintiff-favorable inference may certainly be drawn from Dr. Foster's finding that Plaintiff could not work her "usual" occupation, the ALJ did not unreasonably conclude that Dr. Foster's refusal to indicate that Plaintiff was disabled from all work made his opinion equivocal.

Plaintiff also relies on Dr. Foster's finding that she could not attend job education or training because of her unstable mood, anxiousness, and paranoia.  But this does not show that the ALJ erred in assigning Dr. Newhouse's opinion more weight than the opinions of Drs. Fowler and Foster.  Plaintiff's inability to attend job training does not fully support Dr. Fowler's opinion because the

17

inability to attend job training is not the same as the inability to work "any" job on a consistent basis. Nor is the inability to attend job training necessarily inconsistent with Dr. Newhouse's opinion that Plaintiff was able to perform tasks — which may differ entirely from job training — on a sustained basis. Similarly, it is not necessarily inconsistent with work as a dishwasher. In fact, the VE testified that the dishwasher position permitted no interaction with the public and only occasional interaction with coworkers and supervisors.

Even in view of all the foregoing, the Court acknowledges that the ALJ could have, and perhaps should have, credited Dr. Fowler's opinion and Dr. Foster's opinion over Dr. Newhouse's. But this does not mean that the ALJ reversibly erred. The question on appeal was whether the ALJ was unreasonable in weighing the opinion evidence as she did. *See Rogers*, 486 F.3d at 241 (providing that substantial evidence is not a preponderance of the evidence). The Court cannot conclude that she was.

Plaintiff's second claim of error is that Dr. Newhouse's opinion supports a finding of disability. Plaintiff points out that Dr. Newhouse found that Plaintiff was moderately limited in her "ability to maintain attention and concentration for extended periods" and moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 326-27.) Plaintiff also notes that the VE testified that if someone was off task 25 percent of the workday due to poor concentration, no jobs would be available. To these premises, Plaintiff adds,

> The term "moderately limited" must have some meaning. In a similar setting, the term "often" was defined as occurring 50% of the time. <u>Bankston v. Commissioner</u>, 127 F. Supp.2d 820 (E.D. Mich. 2000)[.] The scale used in <u>Bankston</u> was never = 0%[,] seldom = 25%, often

18

> = 50%, frequent = 75%, constant = 100%. Using the same sliding
> scale as in <u>Bankston</u>, the term "moderately limited" should be defined
> as occurring 50% of the time. The scale invoked here should be: no
> evidence of limitation = 0%, not significantly limited = 25%,
> moderately limited = 50%, markedly limited = 75% .

(Pl.'s Mot. Summ. J. at 10.) It follows, Plaintiff argues, that Dr. Newhouse's moderate-

concentration limitations indicate that Plaintiff is precluded from work.

As an initial matter, the Court notes that other courts have rejected the equivalence between

"often" and "moderate" that Plaintiff proposes:

> [P]laintiff argues by analogy to *Bankston v. Comm'r of Soc. Security*,
> 127 F. Supp. 2d 820 (E.D. Mich. 2000), that "moderate" in Dr.
> Marshall's assessment is equivalent to "often" under the
> Commissioner's prior regulations in effect at the time *Bankston* was
> decided. The viability of the *Bankston* decision has been repeatedly
> questioned as contrary to the Commissioner's Psychiatric Review
> Technique form instructions and the principle of deference to an
> administrative agency's construction of its own regulations. *Benton
> v. Comm'r of Social Security*, 511 F. Supp. 2d 842, 847 (E.D. Mich.
> 2007); *Ogden v. Apfel*, Case No. c-3-00448 (S.D. Ohio 2001)
> (suggesting that *Bankston* is simply wrong because it ignores the
> Commissioner's interpretation of "often" in the regulations).
> *Bankston* correctly notes that a "hypothetical question must consider
> the severity—including the degree and/or frequency—of the
> claimant's concentration problems." *Benton*, 511 F. Supp. 2d at 847.
> However, the *Benton* court rejected the plaintiff's assertion that the
> ALJ must apply a "formulaic 50% reduction in concentration to
> Plaintiff based solely on his finding of a moderate limitation in
> concentration, persistence, and pace." *Id.* Since *Bankston*,
> [20] C.F.R. 404.1520a(c)(4) has been amended to encompass a
> five-level scale based on severity rather than frequency of the
> limitation, as set forth in the scale evaluated in *Bankston*. *Brewer v.
> Comm'r of Social Security*, 2008 WL 719228, *5 (E.D. Mich. 2008).
> This Court has previously concluded that to the extent *Bankston* was
> good law under the old version of § 404.1520a, it is simply
> inapplicable to the current regulation. *Id.*

*Burtch v. Comm'r of Soc. Sec.*, No. 07-14884, 2009 WL 37187, at *13 (E.D. Mich. Jan. 7, 2009);

*but see Brewer v. Comm'r of Soc. Sec.*, No. 07-10357, 2008 WL 719228, at *7 (E.D. Mich. Mar.

17, 2008) ("*Bankston* likely went too far in rewriting the Commissioner's regulations and quantifying 'often' having deficiencies in concentration at 50%, which may be too high for 'often' or 'moderate' concentration limitations.  Yet, even if a moderate deficiency means drifting off task 20%-30% of the time that would have a significant vocational impact unless quotas are eliminated from the hypothetical question or this limit is otherwise accommodated in the question.  It is hard to reasonably accept 'moderate' meaning anything less than 20-30% of the time at work.").

Ultimately, however, the Court need not define the term "moderate" to fully address Plaintiff's claim of error.  In this case, the very doctor who found that Plaintiff had "moderate" concentration problems also found that, despite these problems, Plaintiff could perform tasks on a "sustained basis."  (Tr. 328.)  Thus, Dr. Newhouse's understanding of the term "moderate," when he selected that level of limitation, must be read as consistent with his finding that Plaintiff's concentration was sufficient enough to perform tasks on a sustained basis.  *Cf. Young v. Comm'r of Soc. Sec.*, No. 10-11329, 2011 WL 2601014, at *10 (E.D. Mich. May 23, 2011) *adopted by* 2011 WL 2600599 ("Although Plaintiff correctly cites the moderate limitations noted in the assessment, Plaintiff fails to mention that the same assessment also concluded that Plaintiff is 'capable of unskilled work.'"); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("Plaintiff's objection ignores a particularly compelling piece of evidence provided by the same state psychologist who diagnosed Plaintiff's mental limitations in the first place.  The psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work."); *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) *adopted by* 2008 WL 2478325 ("Plaintiff's argument for the selective adoption of [the State DDS

2:11-cv-14609-JAC-LJM   Doc # 15   Filed 06/29/12   Pg 21 of 22   Pg ID 458

physician's] 'moderate' limitations without considering his ultimate conclusion [that she could work] would amount to a distortion of the record."). It would not be consistent for this Court to *post hoc* define "moderate" as between 25% and 50%, and then say that was the definition that Dr. Newhouse used when rating Plaintiff's mental residual capacity – Dr. Newhouse may have understood "moderate" to mean, for example, 15% off-task time. Restated, Plaintiff's argument works backwards from the VE's conclusion that 25% off-task time precludes work: Plaintiff asks this Court to conclude that Dr. Newhouse operated under that understanding when rating Plaintiff's concentration problems. But this is highly unlikely given Dr. Newhouse's ultimate conclusion about work on a sustained basis. The Court therefore finds no reversible error in this regard.[7]

### G. Conclusion

For the foregoing reasons, this Court finds that substantial evidence supports the Administrative Law Judge's weighing of the opinion evidence. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

---

[7]Moreover, in this case, the ALJ *included* concentration, persistence, or pace limitations; her RFC assessment provided that Plaintiff "would not be able to perform at a production rate or in a fast-paced production environment." (Tr. 18.) The Court is not aware of any case remanding to alter the hypothetical when the ALJ included a quota- or pace-limitation to account for moderate deficiencies in concentration, persistence, or pace.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

Dated: June 29, 2012

---

### PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on June 29, 2012.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson
